UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GREGG SINGER, SING FINA CORP.,
and 9TH & 10TH STREET LLC,

                     Plaintiffs,

                -against-

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF BUILDINGS, THE GREENWICH
VILLAGE SOCIETY FOR HISTORIC PRESERVATION
and BILL DE BLASIO, ROSIE MENDEZ, CARLINA
RIVERA, ANDREW BERMAN, and AARON SOSNICK, in
their individual and official capacities, and JOHN AND JANE
DOE 1-100, whose identities are unknown at present,

                     Defendants.
------------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No.: _____

Plaintiffs, Gregg Singer, Sing Fina Corp., and 9th & 10th Street LLC, by their attorneys, Gerstman Schwartz & Malito, LLP, complaining of the Defendants The City of New York, The New York City Department of Buildings, The Greenwich Village Society for Historic Preservation, Bill de Blasio, Rosie Mendez, Carlina Rivera, Andrew Berman, Aaron Sosnick, and John and Jane Doe 1-100, set forth and allege as follows:

## PRELIMINARY STATEMENT

1.     "The right to proceed pursuant to a valid building permit, no less than any other civil right, is not to be lost because others resort to the streets, or because governmental authorities have improperly placed hurdles barring the appropriate exercise of such right." *Faymor Development Co., Inc. v. Board of Standards and Appeals of the City of New York*, 57 A.D.2d 928 (2d Dep't 1977). This case is about a fight for such a permit spanning nearly two decades—a permit that was eventually twice begrudgingly granted and unfortunately twice subsequently revoked because distractors took to the streets and conspired with governmental authorities to

1

improperly place hurdles barring the legal and as-of-right use of a property well-known as "Old P.S. 64."

2.      This is a case of seller's remorse as much as it is a case about a vindictive political plot aimed at improperly reclaiming property legally sold by New York City, through a public auction, to a private entity that is attempting to renovate a long vacant, old elementary school building into a venerable college student dormitory ("dorm")—a "community facility use" permissible under the restrictive deed currently on the property, the New York City Zoning Resolution, and New York City Department of Buildings Rule 51-01.

3.      What began as a hunch of impropriety over a decade ago has now turned into a complex web of emails, letters, conversations, press statements, and other actions that culminate into a multi-level plan executed over a period of years for one primary purpose: New York City's reacquisition of Old P.S. 64. The Giuliani Administration sold the building at auction, and some elected officials have since decided that they want it back.

4.      Of course, the difficulty in the City accomplishing this goal is that it no longer owns Old P.S. 64, and the building is not for sale. So the City, its various elected officials and their staff, and some third-party locals got creative.

5.      Maintaining an empty property, especially in New York City, is costly, so the City erected barriers everywhere it could with the hope that the Plaintiffs would fold under the pressure—barriers that, upon information and belief, it did not leverage with the same fortitude (if at all) against other similar projects in the City.

6.      Some of those barriers included unprecedented delays, inconsistent representations, blatantly false misrepresentations, and painstaking misinterpretations of both the zoning resolution

and the Plaintiffs' submissions to the DOB (followed by numerous outright refusals to meet and discuss proposed solutions).

7.      Ultimately, the government, together with its private-party opposition team, suppressed speech, violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment, created an unconstitutional condition under the Takings Clause of the Fifth Amendment, tortiously interfered with the Plaintiffs' business relations, and perpetuated *per se* defamatory remarks about the Plaintiffs.

8.      In all, the Defendants' pattern of obstruction has turned a relatively simple zoning question into a conglomerate of irrationalities—one example of which included an outright demand that the Department of Buildings act directly against both its own rule and zoning determinations in order to pacify a local Councilmember, the Mayor, and local special interests in their pursuit to have the building "returned" to the public.

9.      If every similar project in New York City had to pass through the same process that Old P.S. 64 has, very few buildings would ever *start* being built or renovated (let alone actually finished).

10.      As a result of the Defendants' antics over the years, the Plaintiffs' civil rights have been violated, causing significant economic and non-economic damages in the process.

11.      This case is about vindicating those constitutional and state-law rights while seeking recovery for violation of the same.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, over all claims alleged herein arising under 42 U.S.C. §§ 1983 and 1988, and the Constitution of the United States. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue properly lies in this Court because it is a judicial district in which the events and omissions giving rise to the claims alleged herein occurred.

## PARTIES

**A.    The Plaintiffs**

14.     Plaintiff Gregg Singer ("Singer") is a member of 9th & 10th Street LLC, which owns Old P.S. 64, a former public elementary school located at 605 East 9th Street in New York, New York. Singer resides in New York, New York. Singer is also the President of Plaintiff Sing Fina Corp.

15.     Plaintiff Sing Fina Corp. is the Manager of 9th & 10th Street LLC. Sing Fina Corp is a domestic business corporation operating under the laws of New York. It has a principal place of business in New York County.

16.     Plaintiff 9th & 10th Street LLC is a domestic limited liability company operating under the laws of New York. It maintains a principal place of business in New York County. It owns Old P.S. 64, which is located at 605 East 9th Street in New York, New York.

**B.    The Defendants**

17.     Defendant City of New York is a municipal corporation and a political subdivision of the State of New York.

18.     Defendant New York City Department of Buildings ("DOB") is an agency operating under New York City and State laws.

19.     Defendant Greenwich Village Society for Historic Preservation, Inc. ("GVSHP") is a domestic not-for-profit corporation incorporated under the laws of the New York. It maintains a principal place of business in New York County.

20.     Defendant Bill de Blasio ("De Blasio") is the current Mayor of New York City and has held this position since January 1, 2014.

21.     Defendant Rosie Mendez ("Mendez" or "Councilwoman Mendez") is a former member of the New York City Council and represented District 2, which includes the area where Old P.S. 64 is located. Mendez was replaced by Defendant Carlina Rivera in January 2018.

22.     Defendant Carlina Rivera ("Rivera" or "Councilmember Rivera") is the former Legislative Director for Councilwoman Mendez and the current New York City Councilmember for District 2. She assumed this role in January 2018.

23.     Defendant Andrew Berman ("Berman") is the Executive Director of GVSHP and, upon information and belief, has served in that capacity since 2002.

24.     Defendant Aaron Sosnick ("Sosnick") is a well-known billionaire supporter of GVSHP and a director of the East Village Community Coalition. Upon information and belief, he has played a key role in facilitating the misrepresentation of the facts and circumstances serving as the basis of this action. Upon information and belief, Sosnick resides at the Christodora House condo tower located at 143 Avenue B, which is adjacent to Old P.S. 64. He strongly opposes Old P.S. 64's historic adaptive reuse renovation into a dorm.

25.     Defendants JOHN and JANE DOE 1-100 are either unknown at present or Plaintiffs do not yet have sufficient information to properly plead a cause of action against them, but upon information and belief, they are employees, agents, or associates of the Defendants that witnessed, concealed, facilitated, or otherwise participated in the acts to which Plaintiffs were subjected, and

as such, Plaintiffs reserve the right to amend the instant pleading to include the identities of such persons, when and if such identities become known, within the appropriate limitations period.

## FACTS

### A.      The Necessary Context

*The Early Years*

26.      Old P.S. 64 used to be a New York City public elementary school from 1907 until 1977, which is when the school closed due to lacking attendance. On or about 1984, a tenant known as El Bohio Public Development Corporation leased the building from New York City, and, in violation of the lease, illegally rented out rooms, in addition to permitting the unfortunate growth of criminal activity.

27.      On July 20, 1998, the City sold the property through public action to Plaintiff 9th & 10th Street LLC, the current owner, of which Plaintiff Singer is a member and President of its Manager.

28.      Title passed on July 21, 1999, with the following deed restriction encumbering the property: "Use and development of this subject property is restricted and limited to a 'Community Facility Use' as such use is defined in the New York City Zoning Resolution as existing on the date of the auction."

29.      Due to the lease expiration and illegal sublease, El Bohio and its illegal subtenants were evicted on December 27, 2001.

30.      Between 1999 and 2005, Plaintiff Singer contacted 1,200 or so non-profit organizations, schools, and local neighborhood, New York City and State community groups to see if they were interested in leasing space in Old P.S. 64. Voicing concerns of mounting pressure from then-Councilwoman Margarita Lopez, who upon information and belief had threatened their

government funding, none of the groups followed through on leasing space in Old P.S. 64, so Singer decided to change direction and convert the building into a much needed college student dormitory ("dorm")—a Community Facility Use expressly permitted under the Use Group 3 section of the New York City Zoning Resolution ("ZR" or "Zoning Resolution") and the deed restriction.

31.    When the property was sold at auction it included approximately 100,000 square feet of additional development rights. Although a 30 story dorm tower could have been permissibly built at the time, and Singer wished to build a 27 story dorm, Singer agreed—at the request of the New York City Landmarks Preservation Commission (LPC)—to save the Old P.S. 64 façade and front half of the building and construct a much less imposing 19 story dorm, which would comply with the deed restriction and the Zoning Resolution section concerning a Use Group 3 "College or School Student Dormitory."

32.    With the LPC on board, Plaintiff filed for building permits with the DOB in the fall of 2004.

### The Board of Standards and Appeals—The 19-Story Proposal

33.    On November 29, 2004, the DOB issued six objections, one of which ended up before the Board of Standards and Appeals (BSA) in the spring of 2005. The final determination at issue in that case was the Department's denial to remove an objection to plans submitted with a building permit application to develop the building with a Use Group 3 "College or School Student Dormitory" absent the submission of additional information—namely, documentation that substantiated the student dormitory use: "Without a deed or lease with an educational institution, the Department [would not be satisfied] that a dormitory use [was] being established." Exhibit 1.

34.     The specific objection in question—Objection #4—stated the following: "Substantiate dormitory use (UG3). This use is permitted for 'College or School Student' Housing only as per Z.R. (Floors 3-19 indicates res. apartments layout)." *Id*.

35.     At this time, the Department was hunting for an "institutional nexus" between the proposed dormitory and an educational institution, claiming that without this institutional nexus the Plaintiffs could claim the special benefits of building a dorm with the real intention of using the property for residencies.

36.     Plaintiffs explained by letter dated March 1, 2005, that such a switch in course would violate the deed restriction on the property, which required the building be a "Community Facility Use," not residential. In the same letter, Plaintiffs argued that the DOB did not have the power to layer additional requirements on applicants to show such an institutional nexus.

37.     Even if an institutional nexus were required, Plaintiffs believed the requirement was met by a long-term lease of the dormitory to a non-profit entity that would be controlled by educational institutions whose students would license the rights to use the dorm rooms—a model that, upon information and belief, has been implemented successfully throughout the country.

38.     While the Plaintiffs had a lease with such a non-profit entity (University House Corp.) chartered for the benefit of participating educational institutions, the Department found this to be insufficient to satisfy its required (albeit unwritten) institutional nexus requirement.

39.     The issue went before the BSA, which sided with the DOB. It held that "an appropriate showing of conformance, through plans and related application materials, with the use regulations that trigger the applicable FAR regulations is an indisputable part of the DOB's Buildings Code-mandated review of permit applications when a CF use is proposed," and for this reason the DOB's "refusal to lift the Objection for failure to submit documentary evidence of

8

institutional control over the Proposed Dormitory, as set forth in the Final Determination, is an appropriate exercise of its authority." Exhibit 1.

40.     Interestingly, during the pendency of the BSA proceeding, and two days after Plaintiffs' letter responding and questioning the DOB's authority to layer new unwritten requirements on building permit applications, the DOB issued a proposed rule on March 3, 2005, which later became 1 RCNY § 51-01 ("Rule 51" or "Dorm Rule") on March 16, 2005.

*The Infamous "Dorm Rule"*

41.     As outlined in the Statement of Basis and Purpose, Section 51-01 was created "to give meaning to the phrase 'student dormitory' separate and distinct from other residential uses and is intended to codify the Department's current practice of requiring a 'dormitory' to have an institutional nexus to a school(s)." Exhibit 2.

42.     Upon information and belief, Section 51-01 was created specifically in response to an older version of the Plaintiffs' dorm proposal (the 19 story proposal).

43.     The DOB maintains Section 51-01 provides the criteria one must satisfy in order to build a student dormitory that qualifies as a Community Facility Use (UG3) under the Zoning Resolution.[1]

44.     "A student dormitory is a building or part of a building that is (1) operated by, or on behalf of" a qualified educational institution "to house students enrolled at such institution(s)." 1 RCNY § 51-01. Before a building permit will be issued, a restrictive declaration stating that the

---

[1] Plaintiff 9th & 10th Street LLC recently filed a declaratory judgment action in New York State Supreme Court, New York County, asking the Court to determine whether Rule 51 applies to the current version of its project. The Department enacted Rule 51 at the time of Plaintiff's 19-story proposal, which would have involved a zoning bonus applicable to Community Facility Uses. The Rule was apparently meant to regulate such dorm projects. However, Old P.S. 64 has since been landmarked, and the relevant zoning district has been downzoned, making it impossible for Plaintiffs to gain any zoning bonus for building a Community Facility Use. Therefore, Plaintiffs question whether Rule 51 still applies to their property. Even if it does, Plaintiffs believe they complied with its requirements. *See 9th & 10th Street LLC v. The City of New York et al.*, Index No. 161272/2017 (N.Y. Sup. Ct. 2017).

facility shall only be used as student dormitory must be recorded, and a "proof of ownership or control" requirement must be met. There are three specifically enumerated ways to demonstrate "ownership or control," one of which includes providing "[c]opies of a lease of the building or part of the building for a minimum ten year term" by a qualified educational institution. § 51-01.

### The Landmarking of Old P.S. 64

45.     After mounting political pressure, the LPC announced on April 28, 2006, a hearing date to consider landmarking Old P.S. 64.

46.     On June 20, 2006, the LPC voted to landmark Old P.S. 64.

47.     As a result, the Plaintiffs could not (and still cannot) build a 19-story dormitory; rather, Plaintiffs must work within the boundaries of Old P.S. 64's five floors.

### Proceeding to Court: Challenging the BSA Decision

48.     Meanwhile, following the loss at the BSA, 9th & 10th Street commenced an Article 78 proceeding to challenge the BSA's determination.

49.     The New York Supreme Court decided that the Board's reasoning was not arbitrary or capricious because the "DOB had a rational basis for refusing to grant a premises permit to build a dormitory without adequate proof of an institutional nexus between the proposed dormitory and a known school (or schools), or a non-profit entity representing such school (or schools)." *9th & 10th Street LLC v. Board of Standards and Appeals of the City of New York*, 12 Misc.3d 1183(A), at *8 (N.Y. Sup. Ct. 2006), *aff'd*, 10 N.Y.3d 264 (N.Y. 2008). In the Court's eyes, "there would be no practical way to distinguish between a UG3 'community facility' and a UG2 residence" without the additional institutional nexus requirement implemented by the Department *Id.* at 5.

50.     The First Department reversed, holding that the BSA's "anticipatory punishment" of assuming the Plaintiffs will use the building in an illegal manner in the future was arbitrary and

capricious. *See id.* at 41-44. In so holding, the Court reasoned that the BSA's "remedy for any attempt to use the building for an impermissible purpose is either denial or revocation of the certificate of occupancy." *Id.* at 42.

51.     On appeal, the Court of Appeals reversed. The Court drew a line between the "mere possibility of a future illegal use," which would not justify withholding a permit, and where "officials **reasonably fear** that the legal use proposed for a building will prove **impracticable**," which would justify "insist[ence] on a showing that the applicant can actually do what it says it will do." *9th & 10th Street L.L.C. v. Board of Standards and Appeals of the City of New York*, 10 N.Y.3d 264, 269-70 (N.Y. 2008) (emphasis added). The Court explained that "the Department of Buildings doubted that a dormitory use would *ever* be possible, and asked for assurances—in the form of a connection with an educational institution—that it would be." *Id.* at 269-70 (emphasis added). The Court rationalized that to avoid "fac[ing] a choice between waiving the legal restrictions [after the building is already built] and requiring the building to remain vacant or be torn down," the Department's "seek[ing of] such assurances seems no more than prudent." *Id.* at 270.

**B.     The Initial Leases & Stop Work Order**

*Cooper Union & Joffrey Ballet*

52.     On December 7, 2012, Plaintiff 9th & 10th Street entered into a 15 year lease with The Cooper Union for the Advancement of Science and Art ("Cooper Union") for the second floor of Old P.S. 64.

53.     On February 22, 2013, a lease amendment was executed whereby Cooper Union would lease the third floor of Old P.S. 64 as well.

54.     Cooper Union is a qualified post-secondary educational institution authorized to grant a degree by the Regents of the University of the State of New York and therefore satisfies the educational institution requirement of Section 51-01.

55.     The lease with Cooper Union operated in a two-part structure. First, Cooper Union would *lease* the entire second and third floor of the building, which covered ninety eight beds per floor (196 beds total). Second, Cooper Union would then *license* the dorm beds to its students.

56.     This two-part structure created two different kinds of rent to be collected for 9th & 10th Street as the landlord. A "minimum rent" was designated as a fixed amount to be paid per year based on the total number of beds (ninety eight per floor). An additional "student rent" to be paid per month per bed was then to be collected based on the number of beds were licensed to students by Cooper Union.

57.     The purpose of this two-part breakdown whereby the entire second and third floor were leased to Cooper Union and then the beds licensed to Cooper Union's students was created to satisfy Rule 51, and upon information and belief, is the typical structure used for college student dormitories in New York City—the college or university leases or owns the premises and licenses the beds to their students.

58.     An application for a building permit (later issued on August 22, 2014) permitting Plaintiffs to renovate Old P.S.64 into a dorm was filed in February of 2013.

59.     All was well until April 30, 2013, when Councilwoman Mendez wrote to the DOB. The letter contained some generalized objections and asked the DOB to "review this application with precise scrutiny to make sure that the contractual 'lease agreement' meets all of the provisions of the Dorm Rule, including the recording of a Restrictive Deed." Exhibit 3. She further requested that "the DOB refrain from approving this application until such time that the owner can

demonstrate enforceable leases and Restrictive Declarations for all 500 rooms, as the Dorm Rule requires." *Id.*[2]

60.     On May 3, 2013, The Joffrey Ballet Center, Inc. ("Joffrey"), entered the mix when a lease was signed for the ground and first floors of Old P.S. 64.

61.     Although Joffrey did not fall under Section 51-01, it fell under a different section of the Zoning Resolution, which considered a "non-profit institution with sleeping accommodations" to be a permissible UG3 use.

62.     The Joffrey lease was structured the same way as the Cooper Union lease agreements, except that it was for a period of ten years (as opposed to 15) and included 132 beds (as opposed to 196).

63.     From the very beginning, then-Councilwoman Mendez began threatening to undermine the leases with Joffrey and Cooper Union. For example, Mendez was quoted saying "I truly believe that [Cooper Union] President Jamshed Bharucha was not given a complete history of the building when he signed on to this. Cooper is now in an untenable situation with the community, because they were not given all of the facts….I told him I'm not happy with this dorm plan, the community is not happy….There will be protests, and I will be joining in when that happens."[3]

---

[2] Plaintiffs maintain now, as they did then, that Rule 51 has no such requirement. Plaintiffs believe the Rule does not apply to the current proposed use of Old P.S. 64. But even if it did, the express terms of the Rule state precisely the opposite: the Rule is satisfied when a lease for a portion of the building is submitted. *See* 1 RCNY § 51-01.

[3] Sarah Ferguson, *Scaled-Down Dorm Pitched for Embattled CHARAS Site*, THE VILLAGER (April 25, 2013), http://thevillager.com/2013/04/25/scaled-down-dorm-pitched-for-embattled-charas-site/.

64. Demolition permits were issued in March of 2013, and demolition work began on floors 4 and 5 in preparation of converting Old P.S. 64 into a dorm. Demolition work continued through July of 2013 on floors 1 and 3 as well.[4]

65. Much to Councilwoman Mendez's chagrin, on August 22, 2014, the DOB issued work permits for Job # 121329801, which allowed for the conversion of Old P.S. 64 into a dorm (the "2014 Permit"). *See* Exhibit 4.

66. Noticing the issuance of work permits, a furious Councilmember Mendez—scolding the DOB for its non-responsiveness—leaned on the DOB again; she wrote another letter on September 3, 2014. In this letter, she made the following arguments regarding Cooper Union, which were reiterations of her previously sent letters:

- She claimed an "institutional nexus" does not exist. But "[e]ven if it does exist,…this nexus is not continuous because Cooper Union is not entitled to use and occupy the premises from June 1 to August 31 each year."[5]

- She claimed that the "language of the lease was more analogous to a license agreement rather than a lease[.]"[6]

- She claimed "Cooper Union authorizes 9th & 10th Street LLC to subordinate their rights as tenants, meaning that the management company could revoke the rights created within the terms of the lease[.]"[7] Exhibit 5.

---

[4] The second and basement floors were demolished in December of 2009 and February 2010, respectively.

[5] This misstates the substantive portions of the Cooper Union lease. Although Cooper Union did not have summer classes and was not interested in having their students renting beds during that time, Cooper Union still remained a tenant over this time period.

[6] This observation misstated the leasing and renting provisions in the lease.

[7] This observation also misstated the leasing and renting provisions of the lease.

67.     Importantly, at this juncture, the DOB must have known that the Plaintiffs were planning on constructing a dorm, and it had significant time—over a year—to question Plaintiffs' project. The agency had received the building permit application for the 2014 Permit in February of 2013. The permits issued for demolition work to be completed in anticipation of the 2014 Permit's issuance were granted, and demolition had indeed taken place between May 2013 and July 2013. Then, about a year later, the 2014 Permit was issued for the purpose of renovating Old P.S. 64 in August of 2014. The project was proceeding and the DOB did not seem to have any qualms.

68.     But, in a surprising about-face, the DOB backpedaled and issued a stop work order using the very arguments propounded by the Councilwoman on a Job that had only been issued a work permit just a few weeks before, with initial prefatory steps having taken place as described above at least one year prior.

69.     On the same day that the stop work order was issued, the DOB, bending to the Councilmember's will, penned a letter to the Councilwoman to notify her that the "Department has examined your letter and has issued the enclosed 15 day letter with Stop Work Order and objection sheet." Exhibit 6. In the letter to Councilwoman Mendez, the DOB does not actually state that her arguments were valid; it merely notes that it is responding to the Councilwoman's discussion of "potential problems with a construction permit[.]" *Id.*

70.     Although it required nearly a year, the Plaintiffs clarified the misunderstandings noted by the DOB, and all of the objections were resolved on June 17, 2015.

71.     Specifically, Objection 2 maintained that the Cooper Union lease failed to comply with Section 51-01 "in that section 2.6 of the Cooper Union lease says that any beds not rented by

Cooper Union (not in the summer period) may 'be rented by Landlord to any other School and Tenant will not be responsible for such beds.''' <u>Exhibit 7</u>.

72.     Objection 2 was cured by the Plaintiffs' deleting the prior language in section 2.6 of the lease and replacing it in relevant part with the following: "Tenant agrees that any of Tenant's beds that are not licensed by Tenant to Tenant's students shall only be licensed by Tenant to institutions that (a) qualify under 1 RCNY 51-01 and (b) lease and occupy space in the Building. By already occupying space in the building as a qualified 'dormitory,' Tenant's licensing of beds to those institutions meets the requirements set forth in 1 RCNY 51-01." <u>Exhibit 8</u>.

73.     New work permits were issued on July 13, 2015 ("2015 Permits"). <u>Exhibit 9</u>.

74.     Importantly, the DOB issued the 2015 Permits without first requiring the Plaintiffs to submit an updated lease with the newly approved lease language.

75.     A few weeks later, on July 31, 2015, new objections were issued demanding that "revised executed lease(s) shall be submitted to the department as a prerequisite for permit issuance." <u>Exhibit 10</u>. But the original objections regarding the actual structure of the leasing and licensing provisions remained resolved and therefore acceptable to the DOB. The 2015 Permits were also still in place at the time, even though an updated lease had yet to be submitted.

76.     On August 4, 2015, a stop work order was issued.

77.     On October 21, 2015, the DOB issued a letter indicating its intent to revoke the 2015 Permits based in part on the still-missing updated lease with Cooper Union.

78.     Months later, on March 2, 2016, the DOB did in fact revoke the permits.

79.     Upon information and belief, facing mounting pressure from Councilwoman Mendez, the City, and other Defendants, on July 12, 2016, Cooper Union terminated the lease instead of executing a new lease containing the language approved by the DOB in connection with the work permits.

80.     Upon information and belief, and based on an email interaction discovered through a Freedom of Information Law request, Councilmember Mendez had "many…conversations…via telephone and does not recall anything in writing" with Cooper Union for the purpose of convincing the school to terminate the lease with 9th & 10th Street. Exhibit 11.

**C.     Period Between Leases: Discovering All the Requirements**

*The Zoning Determinations*

81.     From 2015 until August 2016, the Plaintiffs worked with the DOB to determine all of the unwritten requirements involved with 1 RCNY § 51-01. During this time period, three Zoning Resolution Determinations (ZRD-1) were issued.

82.     A Zoning Resolution Determination (ZRD-1) is a request for a binding interpretation or clarification of the Zoning Resolution.

83.     On June 19, 2015, the Plaintiffs sought a determination concerning whether a portion of the student dormitory could also be occupied and used during summer months by non-matriculated students and student interns.

84.     The DOB determined that "making the dormitory space available to non-matriculated students and student interns in those months outside of the normal school year is in keeping with the mission of an educational institution." Exhibit 12.

85.     On May 26, 2016, the Plaintiffs requested that the DOB "concur with the interpretation that proof of a qualified lease agreement for a portion of the building is sufficient to

allow the issuance of a Permit for the entire building (within the existing Building envelope) in compliance with 1 RCNY 51-01." Exhibit 13.

86.     The DOB agreed with the Plaintiffs' interpretation.

87.     The May 26, 2016, determination confirmed what the Plaintiffs could infer from a previous zoning determination made three years earlier. On August 8, 2013, the Plaintiffs submitted their leases with both Joffrey and Cooper Union requesting permission to show floors four and five as "vacant/no occupancy in the schedule A" "[w]hile the owner secures lease(s) for the remaining portions of the building." Exhibit 14. The question was whether the DOB would issue permits per Section 51-01 even though parts of the building would be vacant.

88.     The DOB approved the Plaintiffs' interpretations with conditions, holding that showing the fourth and fifth floors as "vacant/no occupancy in the Schedule A" would be allowed, but a Temporary Certificate of Occupancy would be issued with an expiration of 60 days, renewable only upon resubmission to the borough commissioner, and a final Certificate of Occupancy would be issued only when the fourth and fifth floors are no longer vacant. Exhibit 14.

89.     On August 4, 2016, the Plaintiffs sought a determination confirming that a lease between 9th & 10th Street and an educational institution that permits the educational institution to license the beds in the leased premises complies with Rule 51.

90.     The DOB agreed that "Tenant may designate Landlord or Landlord's agent, to act, during the school year, as its agent to license beds to the institutions that (a) qualify under 1 RCNY § 51-01 and (b) lease and occupy space in the building for sub-license to that institution's students and, (2) Tenant m[a]y designate Landlord or Landlord's agent, during the summer months, to act as its agent to license beds for the summer term to student interns, non-matriculated students and to Tenant's matriculated students, if any." Exhibit 15.

### *The Troops Rally & The Mayor Leans In*

91.     Meanwhile, all was not well with the opposition.

92.     Once the Zoning Determinations were issued, Defendant Andrew Berman, through Defendant GVSHP, unleashed a frantic barrage of emails to rally the troops.

93.     On June 29, 2016, Berman wrote an email to the elected officials, including Councilwoman Mendez and representatives from the Manhattan Borough President's Office, stating in pertinent part:

> "If you have not seen it already, please find attached the recently issued DOB determination re: old PS 64. It appears they are going to issue permits for even the unleased portions of the building, allowing work to resume, and possibly allow TCO's for the unleased portions as well….It's imperative that DOB hear from the two offices quickly about this, before we are in an irreversible situation. Would a joint letter from Rosie and Gale to DOB ASAP be possible? Please let us know anything we can do to help." Exhibit 16.

94.     Somewhere during the process, Defendant de Blasio's office became involved as well.

95.     Upon information and belief, following an off-line discussion with the Mayor's Office of Legislative Affairs ("OLA"), Matthew Viggiano, who worked for Councilwoman Mendez at the time, reported back to Defendant Berman and the rest of the group (including Defendants then-Councilwoman Mendez and Councilmember Rivera) with the following message (quoted in pertinent part):

> "By way of an update, we met with the Mayor's Office of Legislative Affairs on July 12th. We discussed ongoing problems with regard to DOB's lack of response to our letters and our concerns with the documents you shared with us as well as the continued potential occupancy of organizations that constitute non-conforming uses. While we didn't get into philosophical argument about should or shouldn't a permit be issued for an entire floor if there is a lessee that will only occupying a portion, the Office of Legislative Affairs did agree that there are issues and that they will direct the DOB to look more closely at the issues we presented. To that end, the DOB will not be issuing any permits for 605 East 9th Street until a comprehensive review of the issues we presented are undertaken. We have been

assured of that by the Mayor's Office Legislative Affairs….I believe we can trust that a thorough review will be taking place and we will check in with them in another week to see where that review is, however, in the meantime nothing will be moving forward with regard to the issuing of permits for CHARAS." <u>Exhibit 17</u>.

96.     Upon information and belief, based in part on the quoted language above in addition to what would soon follow, an agreement formed among Defendants, with then-Councilmember Mendez's office acting as an intermediary, that regardless of the DOB's ZRD-1 interpretation of its own Zoning Resolution, the Mayor's OLA had determined that no progress would be made on the property.

97.     Furthermore, upon information and belief, the Mayor's directive to the DOB to halt progress on Old P.S. 64 was so superficial it did not even require a "philosophical" discussion of whether a permit should be issued for an entire building when the lease covers a portion of the building.

98.     In other words, upon information and belief, the Mayor's office was willing to see to it that the Old P.S. 64 project would be stalled without even addressing key issues central to the entire zoning dispute.

99.     After all, the group's goal was admittedly to leverage the political force of elected officials rather than seeking to follow a more traditional and transparent legal avenue established by law. Defendant Sosnick, a billionaire neighbor and chief pot-stirrer on the Old P.S. 64 opposition team, explained: "EVCC can have attorneys look into challenging this absurd DOB determination, but it would be much stronger knowing the DOB's reasoning and having the challenge come from the Council office." <u>Exhibit 18</u>.

100.    From the Plaintiffs' perspective, it is much more difficult to oppose something one cannot see, so the Defendants' admittedly backroom meetings, promises, agreements, and

understandings would indeed be "stronger" than a more transparent approach conducted through established legal—and openly/readily public—mechanisms.

**D.**   **The Adelphi Lease**

*The Extensive Delays*

101.   On August 2, 2016, 9th & 10th Street entered into a lease for the second and third floors of Old P.S. 64 with Adelphi University ("Adelphi").

102.   Just one week later, on August 11, 2016, Plaintiff submitted the executed lease to the DOB.

103.   Since that time, the Adelphi lease was submitted numerous times to various people, in various departments, at the DOB.

104.    Upon information and belief, OLA's promise to impede the Old P.S. 64 permitting process came true.

105.   After 8 months passed, the DOB had yet to respond to the submitted lease, so Plaintiff Singer wrote an email to DOB Commissioner Chandler inquiring as to the status of the lease-review process on April 6, 2017.

106.   Upon information and belief, taking 8 months to review a lease is an unusual and unprecedented occurrence at the DOB. (Plaintiffs are aware of at least one instance where a 10 year lease for a UG3 school dormitory was reviewed within a matter of a few days. *See 81 East Third Street Realty LLC*, BSA Index No. 155-05-A (April 25, 2006) (mentioning that the applicant submitted a 10 year lease and restrictive declaration for a school dormitory, which led to approval and permits being issued within 3 days)).

107.   Days after Plaintiff Singer's follow-up, on April 20, 2017, the DOB finally made a decision as to the lease, and unfortunately, issued three objections. Exhibit 19.

108.    All three objections dealt with an alleged failure to satisfy the Dorm Rule in one way or another.

109.    After numerous attempts to propose lease amendment language to address the objections, on May 9, 2017, the Plaintiffs', through their counsel, formally responded to each objection by letter, enclosing an executed Lease Modification Agreement, dated May 8, 2017, designed to cure the issues presented by the DOB.

110.    A meeting was then scheduled to take place on May 17, 2017, between Deputy Commissioner Bruno and the Plaintiffs to address the objections in light of the May 8, 2017, Lease Modification Agreement.

111.    Two days before the scheduled meeting, the DOB was made aware by email that "[Adelphi] University has the right of terminating [the lease] in the event that the construction is not reinstated by June 1, 2017." Exhibit 20.

112.    The day before the meeting was scheduled to take place, the DOB cancelled the appointment.

113.    And just over an hour before the cancellation notification was delivered, Plaintiff Singer wrote an email to the Deputy Commissioner and the others who were going to be present at the meeting in order to streamline the meeting by highlighting relevant documents, emphasizing the urgency of the project given Adelphi's August 2018 deadline.

114.    On May 17, 2017—the day the cancelled meeting would have taken place, the DOB delivered a final determination doubling down on the April 20, 2017, objections.

115.    A few days later, on May 25, 2017, Plaintiff Singer wrote to Mona Sehgal, General Counsel for the DOB, requesting a meeting and emphasizing a willingness to work with the DOB in order to secure permits for Old P.S. 64: "Adelphi and ownership is prepared to fully cooperate

with the building department so the building permits can be issued and the project can move forward." Exhibit 21.

116.    Following the DOB's failure to reschedule the meeting it cancelled, Plaintiffs' counsel wrote Commissioner Chandler a letter dated July 31, 2017, addressing all of the standing objections and including an executed Second Lease Modification Agreement dated June 22, 2017, for the DOB's review.

117.    Reading the original lease in conjunction with its two subsequent modification agreements, the final lease is structured similar to the aforementioned former lease with Cooper Union, which contained a two-part leasing/licensing structure.

118.    Under the Adelphi lease,  Adelphi and 9th & 10th Street created a landlord-tenant relationship whereby Adelphi was given exclusive control of the second and third floors of Old P.S. 64 for a non-revocable term of 10 years.

119.     Separate and apart from Adelphi leasing the entire second and third floor is the issue of *licensing* the beds to students. The licensing procedure is built into the lease's three tiered rent system. First, Adelphi *leases* the entire second and third floors of Old P.S. 64 for a minimum rent of a fixed amount. Second, Adelphi then *licenses* the beds on its second and third floors to its students for a rent specified in the lease. Third, once Adelphi recoups the minimum rent amount it paid to 9th & 10th Street as the owner from the beds it licensed to its students, then any rent above and beyond that minimum amount goes to 9th & 10th Street as additional rent. Furthermore, if any of the beds on Adelphi's second or third floor remain unused, those beds will be licensed to other qualifying educational institutions by Adelphi through its designated agent (9th & 10th Street) as defined under the lease.

120.    Despite the similarities of the Cooper Union lease, the language of which was ultimately approved and objection-free, the DOB again issued a final determination on August 22, 2017, refusing to lift all of its April 20, 2017, objections.

121.    Specifically, two objections remain. First, the DOB believes that Adelphi's lease fails to satisfy Section 51-01's proof of ownership or control requirement because it believes the Adelphi lease only gives an option to lease beds in any given year rather than a current leasehold obligation for the beds. Second, the DOB maintains that the educational use at Adelphi's 75 Varick Street location is not clearly documented as a "College or University."

122.    The first objection is meritless because Adelphi leased two floors for 10 years and would license the beds to its students or another college or university in compliance with Section 51-01 and the May 26, 2016, ZRD-1 determination.

123.    The second objection is irrelevant because 75 Varick Street does not concern Plaintiffs' property at Old P.S. 64, and the objection focused on the wrong floor of the building; Adelphi is located on the second floor, not the 13th floor, which was the target of the objection.

124.    The Plaintiffs appealed the August 22, 2017, final determination to the New York City Board of Standards and Appeals on September 21, 2017, seeking the following relief from the BSA: (1) the granting of applicant's appeal as to the items requested, (2) the reversal of the August 22, 2017, final determination, (3) the interpretation of 1 RCNY § 51-01's proof of ownership or control requirement to be satisfied by the lease between Adelphi and 9th & 10th Street, (4) the lifting of the stop work order currently on the project, and (5) the issuance of building permits for the entire building to be converted into a college student dormitory.

### *Explaining the Delays—The Obstructionists Keep Revving Political Engines*

125.    Before Adelphi signed a lease in August 2016, the Defendant Berman coordinated

a plan with the others:

> "We're glad to hear that the Mayor's office is saying nothing is going to be moving
> too soon on this, and no approvals are imminent….[W]e'd like to keep pushing on
> this determination and hopefully getting it overturned, before irreversible harm
> comes from it. As this has broader implications, perhaps it would make sense to
> include other elected officials in this who might also be concerned about this—
> whether the BP or other local elected? Please let us know your thoughts about
> proceeding—we'd be happy to draft a letter to the DOB and the Mayor about this
> if that would be useful." Exhibit 22.

126.    The plan came to fruition in the form of an October 3, 2016, letter to the DOB from

Councilwoman Mendez and numerous other elected officials, including Manhattan Borough

President Gale Brewer.

127.    In a perplexing and internally inconsistent request, the elected officials asked that

the DOB "rescind" the recent Zoning Resolution Determination that would permit the issuance of

building permits for an entire building when a portion of the building is leased.

128.    The elected officials unabashedly justified their request by openly acknowledging

that their demand would require the DOB to act directly against the express words of its own Rule:

> "We understand that the Dormitory Rule contains specific language allowing for
> 'part of a building' to meet the definition of a 'student dormitory,' as DOB
> highlighted in its determination. However, we believe that allowing renovations to
> commence throughout an entire building because a small portion of it is leased to
> an appropriate party will create an avenue through which developers can exploit
> the Dormitory Rule in [a] manner inconsistent with its purpose." Exhibit 23.

129.    After waiting approximately one month, Defendant Berman began to complain:

> "It's now been more than half a year since the Department of buildings first issued
> its ruling. I don't want to wake up one day and find the Department of buildings
> has issued permits for the dorm at the old PS 64 based upon this faulty ruling, which
> we all know no matter what DOB has told you, they are capable of doing at any
> moment. Of course once those permits are issued, will be so much harder to get

them rescinded, and this really has implications that go far beyond old PS 64." Exhibit 24.

130.    Then Defendant Berman discovered that Adelphi had signed a lease with the Plaintiffs, and he swiftly wrote to the Councilwoman's staff to remind them of the "understanding" in place amongst the bunch concerning the stoppage of any inkling of progress emanating from Old P.S. 64 project:

> "I just saw that Adelphi University now seems to be part of the mix for the "dorm" plan for the building….This is deeply concerning, especially since we were under the understanding that nothing about the plan was going to change or happen while the elected were in conversation with DOB and the City." Exhibit 25.

131.    Just days later, Defendant Berman cracked the whip again: "As per these meetings and discussions [we have had], we therefore believe it is critical that the elected officials reach out to the Mayor immediately about this, as was agreed....Assurances from the Mayor's Office of Legislative Affairs aside, we are very concerned that with this ruling in place, DOB might issue permits for 605 East 9th Street at any moment…." Exhibit 26.

132.    Upon information and belief, based on these interactions, whatever "understanding" or "[a]ssurances" were in place, the opposition parties involved were under the impression that their concerted political pressure plan would ward off any potential suitors looking to lease the building in addition to stalling progress in the DOB. *See* Exhibit 26.

133.    Upon information and belief, the opposition team of Defendants was so confident in the power of this "understanding" that they were apparently taken by surprise when Adelphi came on board.

### *Adelphi Terminates the Lease*

134.     Upon information and belief, since at least December 2016, just months after Adelphi's involvement in the Old P.S. 64 project, Defendants have been attempting to leverage the same strategy used to pressure Cooper Union to drop its lease against Adelphi as well.

135.     In an email exchange between the Defendants (and others), Defendant Rivera, the heir to then-Councilmember Mendez's seat, states:

> "I have not found a letter from [Councilwoman] Rosie [Mendez] to Cooper Union. She confirmed with me that many of these conversations happened via telephone and does not recall anything in writing. Should you find the correspondence you mentioned with the language you want to use to write to Adelphi please forward it to me." Exhibit 11.

136.     On October 11, 2017, despite enjoying significant community support,[8] Adelphi terminated its lease with 9th & 10th Street.

137.     Upon information and belief, Adelphi terminated its lease with Plaintiffs as a direct and proximate result of the Defendants' aforementioned actions.

### *DOB: On Second Thought, "I Do Not Feel That a Meeting is Warranted at this Time"*[9]

138.     On September 10, 2017, Singer happened to run into Mayor de Blasio in Tompkins Square Park, where he attempted to explain that Plaintiffs had complied with Rule 51. He followed up via letter dated September 14, 2017, which prompted a referral to and a reply letter from the Department dated October 23, 2017. *See* Exhibit 28.

139.     In the October 23 letter, the Department offered "an appointment," presumably to discuss the DOB's pending objections on the project. *See* Exhibit 29.

---

[8] A petition conducted by members of the community in 2017 gathered over 900 signatures in support of Plaintiffs' Adelphi dorm project. *See* History of Old PS 64 (last visited Dec. 20, 2017), http://oldps64.com/.

[9] *See* Exhibit 27.

140.    By the time October 23 rolled around, Adelphi had already terminated its lease with Plaintiffs, but Singer was eager to accept the offer to meet, especially since prior attempts to schedule a face-to-face meeting had been cancelled and never rescheduled by the Department.

141.    This was an opportunity to discuss what the Department would require in satisfaction of Rule 51 moving forward.

142.    To Plaintiffs' dismay, the Department—in yet another about-face—recanted its offer to meet, doubled down on its August 22, 2017, determination and withdrew the meeting offer it had made to Singer just a few weeks before. *See* Exhibit 27.

## E.      **The End Game**

143.    Through the years, the Defendants have made their purpose clear: they want Old P.S. 64 to be what it once was under the City's ownership—a community center for public use. In other words, they want *their* building back.

144.    Layered atop the zoning requirements imposed by the Zoning Resolution and Rule 51 is a condition to the permission to build and renovate Old P.S. 64—that is, the building's return to the public for (what the Defendants and their agents often call) a "true community use as defined by the stakeholders and residents[.]"[10] And this condition comes with selective, targeted, spiteful treatment for the owner of the building and those affiliated.

145.    It does not matter whether the Zoning Resolution actually permits a student dormitory. (It does.) According to former-Councilwoman Mendez, "There is no room, and no

---

[10] Will Bredderman, *Controversial Project Fractures Manhattan Council Race*, CRAIN'S NEW YORK BUSINESS (Sept. 11, 2017), http://www.crainsnewyork.com/article/20170911/POLITICS/170909894/controversial-project-fractures-manhattan-council-race (quoting Defendant Rivera). Upon information and belief, this "true community use" designation highlights the Defendants' acknowledgment of the difference between the legal definition of "Community Facility Use," which includes a student dormitories under the Zoning Resolution, and the Defendants' own beliefs of what a "community use" *should* be.

desire, and no way, we will live with a dorm in our backyard," and "Singer [should] give us back our building."[11]

146.     Defendants Berman and GVSHP recently explained in their January 2018 newsletter that "a stalemate has persisted" because Plaintiffs have "refused to restore the building [to being a public community center], relinquish control, or locate legal *and* appropriate uses there," which in their eyes must be a "true community use"—that is, a public community center. Exhibit 30 (emphasis added). In other words, they believe a "legal" use is not enough; it must be both *legal* and *appropriate* based their own interpretations of those words.

147.     Sharing the sentiment, Senator Hoylman has explained that he "doesn't feel that a dorm is an appropriate community use for this building,"[12] and because "CHARAS/El Bohio Community Center was a cherished public space for Lower East Side residents…[, he] will continue to work with allies to return the building to community use."[13]

148.     Even Defendant de Blasio has weighed in. Apparently, "[b]efore leaving office, Councilmember Rosie Mendez secured a public commitment from Mayor de Blasio to seek to return the building to a public, community use." Exhibit 30. Speaking on behalf of the City, the Mayor announced "the City's interest in reacquiring that building" (even though it is not for sale) in an effort to "right the wrongs of the past" by "work[ing] with Councilmember Mendez and her

---

[11] Sarah Ferguson, *Dormitory Foes Warn Cooper: Don't Get in Bed with Singer*, THE VILLAGER (May 16, 2013), http://thevillager.com/2013/05/16/dormitory-foes-warn-cooper-dont-get-in-bed-with-singer/

[12] Sarah Ferguson, *Trumped-Up Dorm Rally Used Hired Actors*, THE VILLAGER (Nov. 22, 2017), http://thevillager.com/2017/11/22/trumped-up-dorm-rally-used-hired-actors/

[13] Brad Hoylman, *Rallying for Former CHARAS/El Bohio Community Center*, NEW YORK STATE SENATE (May 16, 2013), https://www.nysenate.gov/newsroom/articles/brad-hoylman/rallying-former-charasel-bohio-community-center

successor to get that done," given the "failed mistake" of "plac[ing] that building in the hands of a private owner[.]"[14]

149.    Upon information and belief, the Plaintiffs have been unable to build a student dormitory because of their refusal to accede to the Defendants' demand of returning Old P.S. 64 to public use.

150.    Based on the Defendants' representations to the public, the City is determined to find a way to get Old P.S. 64 back should the Plaintiffs refuse to comply with their demand to use the building as some form of a public community center.

151.    And, upon information and belief, the rest of the Defendants will work to ensure that the City continues to remain steadfast in this endeavor.

152.    In the words of Defendants Berman and GVSHP: "We intend to hold the Mayor to this commitment[.]" Exhibit 30.

## FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – First Amendment
(As against all Defendants)

153.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

154.    The First Amendment prohibits government entities and their actors from "abridging the freedom of speech," including the rights to assemble and petition. U.S. Const. amend. I.

155.    Specifically, the First Amendment protects the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

---

[14] Levar Alonzo & Lincoln Anderson, *City is "Interested in Reacquiring" Old P.S. 64, Mayor Tells Town Hall*, THE VILLAGER (Oct. 13, 2017), http://thevillager.com/2017/10/13/city-interested-in-reaquiring-old-p-s-64-mayor-tells-town-hall/

The right of expressive association preserves a diversity of ideas and shields expression from suppression.

156.    However, statements by government officials that can reasonably be interpreted as intimating some form of punishment or adverse regulatory action following the failure to accede to the government's requests are actionable First Amendment violations.

157.    Indeed, even the deterrence in the distribution of items containing protected speech caused by the government's pronouncements can give rise to a cognizable First Amendment claim.

158.    And while evidence of chilled speech is sufficient to state a First Amendment cause of action where a defendant's acts that caused the chilling were motivated or substantially motivated by the exercise of a plaintiff's First Amendment rights, demonstrating non-speech related harm also establishes a viable claim.

159.    In joining the dorm renovation vision, Plaintiffs' tenants became associated with the Old P.S. 64 project for expressive, in addition to economic, purposes—that is, with the understanding that renovating Old P.S. 64 would be a political endeavor that would require engaging both government and private opposition.

160.    In petitioning the various branches of government through emails, letters, and other forms of communication, much of which is mentioned above, the Plaintiffs and their tenants jointly associated for the First-Amendment-protected, expressive purpose of communicating a specific idea both to the government and the public in general: Old P.S. 64's legacy is best served by being renovated into a student dormitory—a use that closely parallels its student-oriented origins and provides a benefit to the community by playing a role in increasing educational access.

161.    The Plaintiffs repeatedly communicated this joint, expressive message to various elected officials and government representatives, including the named Defendants, and the public.

162.    At times, in petitioning for assistance or engaging in advocacy, Plaintiffs' tenants served as direct deliverers of the joint, expressive message, as opposed to relying on the Plaintiffs' alone. For example, on November 26, 2016, Adelphi's Executive Vice President of Finance and Administration, Timothy P. Burton, penned a letter to Mayor de Blasio to request assistance while emphasizing that the "owner needs a building permit to help [Adelphi] meet th[e] goal" of "increasing" its "Manhattan presence." Exhibit 31. "This vacant building, once renovated, will provide affordable student housing for our students who will study at our Manhattan Center." Exhibit 31. "I would appreciate any help you can provide to expedite obtaining the requested building permit from the DOB," since the "building plans have already been approved by DOB" and the Plaintiffs "immediately submitted the lease for approval to the [DOB]" soon after the lease was executed on August 2, 2016. Exhibit 31.

163.    From the very beginning, the Defendants targeted Adelphi because of its First Amendment protected conduct and its expressive association with the dorm message for the purpose of squelching its speech.

164.    As soon as Adelphi became affiliated with the dorm message, Defendants undertook a concerted, persistent, and retaliatory plan to stifle Plaintiffs' dorm speech by intentionally destroying its expressive association with Adelphi.

165.    On December 2, 2016, Defendant Berman noticed a filing on New York City's website that identified Adelphi as part of the dorm plan, and he notified Defendant Rivera of his discovery. Exhibit 25.

166.    Upon information and belief, a few days later, on December 5, a meeting attended by some or all of the Defendants was held to hatch a plan to interfere with Adelphi and Plaintiffs' expressive message. *See* Exhibit 26.

167.    Based on the "very productive call" had by the Defendants on December 5, a two-part plan was reiterated in subsequent emails among the group over the next two days.

168.    Apparently, two key plans of attack comprised the scheme: traditional lobbying and direct interference with Plaintiffs' joint expressive association with Adelphi and their speech. Defendant Berman summarized: "We look forward to seeing the electeds' letter to the Mayor's office and getting details about the community meeting. Once we have a copy of Rosie's prior letter to Cooper Union about PS 64, we can use that as a model for the community group's letter to Adelphi." Exhibit 32. Defendant Sosnick chimed in that since "Adelphi ha[d] already reached out to the Mayor's Office in favor of the project," it was "urgent to reach out to Adelphi to let them know the history of the building and what they are walking into." Exhibit 32. The goal was to ensure that "permits aren't issued in the dead of the holidays based on one side's lobbying." *Id.*

169.    In other words, in retaliation to Adelphi's joint lobbying, communications, and petitioning of government—all of which is First Amendment protected activity, the Defendants' immediate reaction was to engage in purposeful, targeted, and threatening acts, aside from engaging in their own advocacy, that would let Adelphi know "what they are walking into."

170.    Feeding off of Defendant Sosnick's comments, Defendant Berman quickly followed up: "Carlina and Susan, have either of you found Rosie's past letter to Cooper about this that was vetted with the Council's lawyers for us to use for our letter to Adelphi?" Exhibit 32.

171.    Based on this email, not only was the government and its staff acting jointly with the private defendants and their people, it was also actively proofreading, "vett[ing]," and engaging in joint and coordinated messaging with the private defendants in response to, and for the purpose of interfering with, Adelphi and Plaintiffs' protected First Amendment activity.

172.     Surprisingly, this was not the government's first rodeo either: the plan executed against Adelphi was admittedly a carbon copy of a previous ploy brought against Plaintiffs' previous tenants, Cooper Union and Joffrey Ballet—both of which dropped out the picture soon after the Defendants became involved.

173.     The proof of the intentional, retaliatory interference is in their own words: Councilmember Rivera seems to have checked with then-Councilwoman Mendez about the exact technique used against Cooper Union and Joffrey Ballet (at the request of Berman). Thankfully, she memorialized her conversation with the then-Councilwoman in an email to the rest of the group: "I have not found a letter from Rosie to Cooper Union. She confirmed with me that many of those conversations happened via telephone and does not recall anything in writing." Exhibit 11.

174.     Upon information and belief, whatever "conversations" occurred between then-Councilmember Mendez and Plaintiffs' tenants, they were made for the purpose of interfering with the Plaintiffs' expressive association with Cooper Union and Joffrey Ballet, and they succeeded in coercing the tenants to disassociate with Plaintiffs and stop their pro-dorm advocacy, thereby chilling their speech.

175.     Upon information and belief, with assurances from Defendant De Blasio's office in hand, the Defendants coordinated and executed a retaliatory plan based off of their original Cooper Union scheme, but this time, Adelphi—the new tenant associating with Plaintiffs' dorm message—was the target.

176.     Leveraging their authority and credentials as government officials, Defendants intentionally orchestrated a series of regulatory retaliatory acts under color of law in response to Adelphi's expressive association with Plaintiffs' message.

177.     Following Berman's prodding reminders of the "assurances" made by the "Mayor's Office of Legislative Affairs" in the summer of 2016, which appeared to refer to the promise made by the Mayor's office to "direct the DOB to look more closely at the issues" and refrain from "issuing any permits for 605 East 9th Street until a comprehensive review of the issues we presented [is] undertaken," Exhibit 17, the Defendants worked to ensure that Plaintiffs' project would encounter significant delays before the DOB.

178.     In fact, then-Councilwoman Mendez and her government-official supporters demanded Defendant de Blasio deliver on the assurances previously made by his staff on July 12th and November 7th that "all rules and restrictions would be adhered to," which in their eyes meant "urg[ing] DOB and the Administration's attorneys to revisit DOB's approach to Mr. Singer's proposals and closely watch the use of the Old PS 64 building to ensure that it is in full compliance with the law." Exhibit 33.

179.     Receiving the message loud and clear, the DOB continued the delayed review of the lease for a total of roughly 8 months—an unprecedented amount of time to review a lease (versions of which had already been previously reviewed by DOB)—and issued objections based on the Councilwoman's analysis.

180.     The DOB's April 20, 2017, objections, which were later reiterated in the August 22, 2017, determination, were contra to previous above-mentioned determinations issued by the DOB in relation to this property.

181.     As a result of the Defendants intentional and purposeful retaliatory actions, Adelphi's speech was actually chilled when it cancelled its lease with Plaintiffs on October 11, 2017, and disassociated with Plaintiffs dorm related advocacy.

182.    As a result of the Defendants intentional and purposeful retaliatory actions, Adelphi cancelled its lease prematurely, for it had purposefully negotiated additional time thresholds for cancelling the lease well into 2018.

183.    As a result of the Defendants intentional and purposeful retaliatory actions, Adelphi has even refused to communicate with Plaintiffs, ignoring their outreach attempts.

184.    Driving additional metaphorical nails into Plaintiffs' First Amendment rights, Defendant de Blasio publically declared—just two days after Adelphi cancelled its lease with Plaintiffs—"the city's interest in reacquiring" Old P.S. 64.[15]

185.    Despite the Mayor's public display of enthusiasm, none of the Defendants or their staff has contacted Plaintiffs to discuss their newfound interest in reacquiring the property after Defendant de Blasio made that announcement.

186.    Upon information and belief, this statement was made for the purpose of discouraging other potential tenants from associating with the Plaintiffs and their dorm-related message.

187.    The combination of the Defendants' publically known regulatory actions taken against Plaintiffs and the City's declared "interest in reacquiring" the Plaintiff's building, along with the Mayor's characterization of its sale to Plaintiff as a "wrong of the past" that must be made "right" with the help of "Councilmember Mendez and her successor," the government defendants have directly, purposefully, and in retaliatory fashion interfered with Plaintiff's First Amendment rights by crippling its pro-dorm message and ability to associate for expressive and economic purposes with future tenants.

---

[15] Levar Alonzo & Lincoln Anderson, *City is "Interested in Reacquiring" Old P.S. 64, Mayor Tells Town Hall*, THE VILLAGER (Oct. 13, 2017), http://thevillager.com/2017/10/13/city-interested-in-reaquiring-old-p-s-64-mayor-tells-town-hall/

188.    At all times relevant herein, Plaintiffs had interests protected by the First Amendment.

189.    At all times relevant herein, Plaintiffs actions were protected by the First Amendment.

190.    At all times relevant herein, the actions taken by Defendants, under color of law, in violation of the Plaintiffs' First Amendment rights were motivated or substantially motivated by the Plaintiffs' exercise of that right.

191.    At all times relevant herein, the Defendants' actions effectively and actually chilled the Plaintiffs' exercise of their First Amendment rights.

192.    At all times relevant herein, the Plaintiffs' have been singled out and subjected to adverse retaliatory treatment by the Defendants because of their First Amendment protected activities.

193.    At all times relevant herein, because of the Plaintiffs' refusal to accede to the Defendants' desired use and taking of Old P.S. 64, Defendants unleashed a tirade of oral and written statements that can reasonably be interpreted as intimating some form of punishment or adverse regulatory action, and the Defendants have in fact succeeded in staying true to these intimations.

194.    At all times relevant herein, the burden on the Plaintiffs' First Amendment rights has been substantial and the Defendants' had available means to express their feelings about Old P.S. 64 that would have been significantly less restrictive of Plaintiffs' First Amendment rights.

195.    As demonstrated above, each of the individually named Defendants has been personally involved in subjecting the Plaintiffs to the constitutional violations alleged herein.

196.    Each of the government-employed Defendants is a high level policymaker that has the power and ability to establish municipal policies, including the responsibility to train or supervise subordinates.

197.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies.

198.    Collectively and individually, the Defendants have been acting pursuant to a longstanding policy or custom, which has amounted to a continuous violation, of acting with deliberate indifference, malice, and bad faith against Plaintiffs in violation of their constitutional rights.

199.    There is no legitimate or compelling state interest or objective unrelated to the suppression of ideas justifying the selective, spiteful, targeted, and differential treatment to which Defendants' subjected the Plaintiffs in violation of their First Amendment rights.

200.    To the extent the constitutional violations suffered by Plaintiffs where facilitated by agents of the Defendants, the Defendants were grossly negligent in the supervision of their subordinates who facilitated the constitutional violations experienced by the Plaintiffs and failed to act on information indicating that unconstitutional acts were occurring.

201.    As a direct and proximate result of the Defendants' deliberate policy or custom, Plaintiffs have sustained both economic and non-economic damages.

**SECOND CAUSE OF ACTION**

42 U.S.C. § 1983 – Equal Protection: Selective Enforcement
(As against all Defendants)

202.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

203.    The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people alike.

204.    Plaintiffs were treated differently than other similarly situated individuals.

205.    Plaintiffs experienced differential treatment based on impermissible considerations, including Defendants' malicious and bad faith intent to injure the Plaintiffs.

206.    Both Cooper Union and Adelphi are educational institutions covered by Rule 51.

207.    Both the Cooper Union lease and the Adelphi lease were for a period of at least 10 years, as required by Rule 51.

208.    A restrictive declaration has been in place on the property since July 2013, as required by Rule 51.

209.    When Plaintiffs had a lease with Cooper Union, which is an educational institution like Adelphi, the DOB issued permits for compliance with Rule 51 for a lease that contained a two-part structure whereby two floors of Old P.S. 64 would be leased to Cooper Union and the beds on those floors then licensed to students.

210.    The DOB issued the 2015 Permits for the Cooper Union project before a finalized lease was submitted.

211.    The DOB has refused to issue the same kind of permits for the Adelphi lease, even though it was structured the same way and was otherwise similar to the Cooper Union lease.

212.    Upon information and belief, the DOB has also selectively and purposefully subjected Plaintiff to an abnormally long and tedious review process different that of other similarly situated school dorm projects.

213.    For example, the DOB scrutinized the Adelphi lease for about 8 months when it only took 3 days to review a lease of another school dorm building located at 81 East 3rd Street in Manhattan.

214.    The DOB and its representatives have expressly refused Plaintiffs' good faith attempts to meet and resolve any objections to the project in person; such meetings have been in fact offered and scheduled, only to be quickly cancelled.

215.    Furthermore, the DOB has made zoning determinations interpreting the Zoning Resolution as permitting the issuance of permits to renovate an entire building even when only a portion of the building—namely, a few floors—is leased.

216.    The DOB made these zoning determinations before the Adelphi lease was submitted to the DOB.

217.    Under the Adelphi lease, the DOB has taken a contradictory stance on the same issues addressed by the zoning determinations.

218.    The DOB has taken these opposite and inconsistent positions because of political pressure and other forms of interference coordinated and planned by the other named Defendants.

219.    As demonstrated above, each of the individually named Defendants have been personally involved in subjecting the Plaintiffs to the constitutional violations alleged herein.

220.    Each of the government-employed Defendants is a high level policymaker that has the power and ability to establish municipal policies, including the responsibility to train or supervise subordinates.

221.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies and actions.

222.    In so acting, collectively and individually, Defendants have a longstanding policy or custom, which has amounted to a continuous violation, of acting with deliberate indifference, malice, and bad faith against Plaintiffs in violation of their constitutional rights.

223.    Defendants have been operating under color of law and in violation of Plaintiffs' constitutional rights.

224.    Upon information and belief, the Defendants selectively enforced Rule 51 and approval process involving dormitories knowing full well that other similarly situated projects were not and had not been subjected to the same, tedious level of scrutiny.

225.    Upon information and belief, the dorms located at the following addresses were not (or are not currently being) subjected the same, tedious level of scrutiny as Plaintiffs' project: 200 E. 6th Street; 120 East 12th Street; 318 E. 15th Street; 407 First Avenue; 33 Beekman Street; 182 Broadway; and 555 10th Avenue.

226.    There is no legitimate state interest or objective justifying the selective, spiteful, targeted, and differential treatment the Defendants have subjected the Plaintiffs and their attempts to renovate Old P.S. 64 into a dorm.

227.    To the extent the constitutional violations suffered by Plaintiffs where executed by agents of the Defendants, the Defendants were grossly negligent in the supervision of their subordinates who facilitated the constitutional violations experienced by the Plaintiffs and failed to act on information indicating that unconstitutional acts were occurring.

228.    As a direct and proximate result of the Defendants' deliberate actions, executed pursuant to a policy or custom, Plaintiffs have sustained both economic and non-economic damages.

## **THIRD CAUSE OF ACTION**

42 U.S.C. § 1983 – Equal Protection: Class of One
(As against all Defendants)

229.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

230.    The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people alike.

231.    Plaintiffs were intentionally treated differently from other similarly situated individuals.

232.    The differential treatment encountered by Plaintiffs was motivated by animus and resulted in unequal treatment that was inconsistent, arbitrary, and without rational or legitimate basis.

233.    The Defendants and their agents knowingly treated the Plaintiffs differently from others similarly situated knowing full well that the unequal treatment was inconsistent, arbitrary, and without rational or legitimate basis.

234.    Both Cooper Union and Adelphi are educational institutions covered by the Rule 51.

235.    Both the Cooper Union lease and the Adelphi lease were for a period of at least 10 years, as required by the Rule 51.

236.    A restrictive declaration has been in place on the property since July 2013, as required by Rule 51.

237.    When Plaintiffs had a lease with Cooper Union, which is an educational institution like Adelphi, the DOB issued permits for compliance with Rule 51 for a lease that contained a

two-part structure whereby two floors of Old P.S. 64 would be leased to Cooper Union and the beds on those floors then licensed to students.

238.    The DOB issued permits for the Cooper Union project before a finalized lease was submitted.

239.    The DOB has refused to issue permits for the Adelphi lease, even though it was structured the same way and was otherwise similar to the Cooper Union lease.

240.    Upon information and belief, the DOB has also selectively and purposefully subjected Plaintiff to an abnormally long and tedious review process different that of other similarly situated school dorm projects.

241.    For example, the DOB scrutinized the Adelphi lease for 8 months when it only took 3 days to review a lease of another school dorm building located at 81 East 3rd Street in Manhattan.

242.    The DOB and its representatives have expressly refused Plaintiffs' good faith attempts to meet and resolve any objections to the project in person; such meetings have been in fact offered and scheduled, only to be quickly cancelled.

243.    Furthermore, the DOB has made zoning determinations interpreting the Zoning Resolution as permitting the issuance of permits to renovate an entire building even when only a portion of the building—namely, a few floors—is leased.

244.    The DOB made all of these zoning determinations before the Adelphi lease was submitted to the DOB.

245.    Under the Adelphi lease, the DOB has taken the opposite stance on the same issues addressed by the zoning determinations.

246.    The DOB has taken these opposite and inconsistent positions because of political pressure and other forms of interference coordinated and planned by the other named Defendants.

247.    As demonstrated above, each of the individually named Defendants have been personally involved in subjecting the Plaintiffs to the constitutional violations alleged herein.

248.    Each of the government-employed Defendants is a high level policymaker that has the power and ability to establish municipal policies, including the responsibility to train or supervise subordinates.

249.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies.

250.    In so acting, collectively and individually, Defendants have a longstanding policy or custom, which has amounted to a continuous violation, of acting with deliberate indifference, malice, and bad faith against Plaintiffs in violation of their constitutional rights.

251.    Defendants have been operating under color of law and in violation of Plaintiffs' constitutional rights.

252.    Upon information and belief, the Defendants selectively enforced Rule 51 and the approval process involving dormitories knowing full well that other similarly situated projects were not and had not been subjected to the same, tedious level of scrutiny.

253.    Upon information and belief, the dorms located at the following addresses were not (or are not currently being) subjected the same, tedious level of scrutiny as Plaintiff's project: 200 E. 6th Street; 120 East 12th Street; 318 E. 15th Street; 407 First Avenue; 33 Beekman Street; 182 Broadway; and 555 10th Avenue.

254.    There is no legitimate state interest or objective justifying the selective, spiteful, targeted, and differential treatment the Defendants have subjected the Plaintiffs and their attempts to renovate Old P.S. 64 into a dorm.

255.     To the extent the constitutional violations suffered by Plaintiffs where executed by agents of the Defendants, the Defendants were grossly negligent in the supervision of their subordinates who facilitated the constitutional violations experienced by the Plaintiffs and failed to act on information indicating that unconstitutional acts were occurring.

256.     As a direct and proximate result of the Defendants' deliberate actions, executed pursuant to a policy or custom, Plaintiffs have sustained both economic and non-economic damages.

## FOURTH CAUSE OF ACTION

42 U.S.C. § 1983 – Substantive Due Process
(As against all Defendants)

257.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

258.     The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Cost. Amend. XIV, § 1.

259.     Plaintiffs have a substantive due process right to be free from arbitrary government action.

260.     Plaintiffs have a valid property interest in a building permit that will allow Old P.S. 64 to be renovated into a dorm.

261.     Plaintiffs were deprived of this valid property interest when their building permits were revoked.

262.     Plaintiffs were also deprived of this valid property interest when their building permits were never issued.

263.     Plaintiffs dedicated substantial resources—financial and otherwise—in reliance on their building permits and all of the rights and privileges involved with the same.

264.    Plaintiffs have a legitimate claim of entitlement, and absent the denial of due process, there is a very strong likelihood that the application for the permit should have been granted (and, in the case of the 2014 and 2015 Permits, not revoked).

265.    As demonstrated above, the Defendants have deprived the Plaintiffs of the aforementioned property interest in a way that is so outrageously arbitrary, conscience shocking, and oppressive in a constitutional sense as to be a gross abuse of government authority.

266.    Each of the individually named Defendants have been personally involved in subjecting the Plaintiffs to the constitutional violations alleged herein.

267.    Each of the government-employed Defendants is a high level policymaker that has the power and ability to establish municipal policies, including the responsibility to train or supervise subordinates.

268.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies.

269.    Acting collectively and individually, Defendants have a longstanding policy or custom, which has amounted to a continuous violation, of acting with deliberate indifference, malice, and bad faith against Plaintiffs in violation of their constitutional rights.

270.    Defendants have been operating under color of law and in violation of Plaintiffs' constitutional rights.

271.    Upon information and belief, the Defendants selectively enforced Rule 51 and the approval process involving dormitories knowing full well that other similarly situated projects were not and had not been subjected to the same, tedious level of scrutiny.

272.     Upon information and belief, the dorms located at the following addresses were not (or are not currently being) subjected the same, tedious level of scrutiny as Plaintiff's project: 200 E. 6th Street; 120 East 12th Street; 318 E. 15th Street; 407 First Avenue; 33 Beekman Street; 182 Broadway; and 555 10th Avenue.

273.     There is no legitimate state interest or objective justifying the selective, spiteful, targeted, and differential treatment the Defendants have subjected the Plaintiffs and their attempts to renovate Old P.S. 64 into a dorm.

274.     To the extent the constitutional violations suffered by Plaintiffs where executed by agents of the Defendants, the Defendants were grossly negligent in the supervision of their subordinates who facilitated the constitutional violations experienced by the Plaintiffs and failed to act on information indicating that unconstitutional acts were occurring.

275.     As a direct and proximate result of the Defendants' deliberate actions, executed pursuant to a policy or custom, Plaintiffs have sustained both economic and non-economic damages.

## FIFTH CAUSE OF ACTION

42 U.S.C. § 1983 – Unconstitutional Conditions Doctrine
(As against all Defendants)

276.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

277.     The Plaintiffs have submitted applications for building permits that will allow for the renovation of Old P.S. 64 into a dormitory.

278.     A permit allowing such renovation was initially issued by the DOB on August 22, 2014, under the Permit Number 121329801-01-AL.

279.    At the behest of the other Defendants, specifically Councilmember Mendez, the DOB revoked the 2014 Permit.

280.    Following the Plaintiffs' diligent and good-faith attempts to resolve the objections made by the DOB, the objections were resolved and a new permit issued on July 13, 2015.

281.    In the meantime, the Defendants were actively working to undermine the lease Plaintiffs had with Cooper Union and Joffrey Ballet at the time.

282.    Upon information and belief, an updated lease making the corrections required to remedy the DOB's objections was not signed due to the efforts of the Defendants.

283.    Soon after, in August of 2016, Adelphi signed a lease with the Plaintiffs, which was promptly submitted to the DOB for review.

284.    The Defendants again interfered with the DOB's permitting process, causing extensive delays, among other interference, which significantly undermined the time-sensitive dorm project.

285.    The Defendants knew that the project stemming from the Adelphi lease was time-sensitive because the Plaintiffs had written numerous letters to the Defendants informing them as such.

286.    Upon information and belief, due to the Defendants' obstructionist maneuvers, Adelphi terminated the lease associated with renovating Old P.S. 64 into a dorm.

287.    The Defendants' actions over the years have amounted to a concerted effort, executed under color of law, to undermine the Plaintiffs' ability to renovate Old P.S. 64 into a dorm in violation of Plaintiffs' constitutional rights.

288.    The Defendants have and will continue to obstruct the Plaintiffs' attempts to renovate Old P.S. 64 into a dorm, even though Plaintiffs are legally permitted to build a dorm as-

of-right, so long Plaintiffs refuse to operate the same kind of public community center that existed in the building before Plaintiffs purchased Old P.S. 64 at auction nearly two decades ago.

289.    The Defendants have repeatedly made it known, often through statements to the media, that they will continue to obstruct the Plaintiffs' dorm project until the building is (somehow) returned to the community to be what it once was—a community center open to the public.

290.    Upon information and belief, the Defendants will continue to use their authority and influence to obstruct the Plaintiffs, no matter what kind of project Plaintiffs propose, unless Plaintiffs concede to either (1) return the building to New York City for use as a public community center or (2) agree to renovate Old P.S. 64 into a community center for public use.

291.    In this way, the Defendants have conditioned the issuance and maintenance of a building permit that will allow Plaintiffs to renovate Old P.S. 64 upon the Plaintiffs allowing Old P.S. 64 to be a community center for public use.

292.    As such, Defendants have conditioned the issuance and maintenance of a building permit (and all the rights and privileges associated with the same) on an unconstitutional condition.

293.    The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation."

294.    Under the Unconstitutional Conditions Doctrine, the government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property.

295.    Acceding to the Defendants' condition, which the Plaintiffs' refuse to do, would constitute a taking under applicable law.

296.    There is no essential nexus between a legitimate government interest and the permit condition that the Defendants are attempting to exact.

297.    The condition the Defendants seek to exact lacks the rough proportionality required by applicable law.

298.    As demonstrated above, each of the individually named Defendants has been personally involved in subjecting the Plaintiffs to the constitutional violations alleged herein.

299.    Each of the government-employed Defendants is a high level policymaker that has the power and ability to establish municipal policies, including the responsibility to train or supervise subordinates.

300.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies.

301.    Collectively and individually, the Defendants have been acting pursuant to a longstanding policy or custom, which has amounted to a continuous violation, of acting with deliberate indifference, malice, and bad faith against Plaintiffs in violation of their constitutional rights.

302.    There is no legitimate state interest or objective justifying the selective, spiteful, targeted, and differential treatment creating the unconstitutional condition the Defendants have subjected the Plaintiffs and their attempts to renovate Old P.S. 64 into a dorm.

303.    To the extent the constitutional violations suffered by Plaintiffs where facilitated by agents of the Defendants, the Defendants were grossly negligent in the supervision of their subordinates who facilitated the constitutional violations experienced by the Plaintiffs and failed to act on information indicating that unconstitutional acts were occurring.

304.     As a direct and proximate result of the Defendants' deliberate policy or custom, Plaintiffs have sustained both economic and non-economic damages.

## SIXTH CAUSE OF ACTION

42 U.S.C. § 1983 – Conspiracy
(As against all Individual Defendants)

305.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

306.     At all relevant times herein, the Defendants conspired amongst themselves in a way that deprived Plaintiffs of their constitutional rights.

307.     Specifically, at all times relevant herein, the Defendants conspired amongst themselves to deprive Plaintiffs of their Equal Protection, Substantive Due Process, and First Amendment Rights under the United States Constitution, in addition to creating an unconstitutional condition under the Takings Clause of the Fifth Amendment.

308.     At all relevant times herein, Defendants acted in concert to inflict the unconstitutional injures alleged herein by entering into an understanding and concerted agreement that would prevent Plaintiffs from renovating Old P.S. 64 into a dorm, which has—thus far—been a successful endeavor.

309.     The Defendants engaged in multiple overt acts in furtherance of their goals, which resulted in substantial economic and non-economic damages, by engaging in actions that actively interfered with and substantially delayed Plaintiffs' ability to renovate Old P.S. 64 into a dorm.

310.     Upon information and belief, some of the Defendants, specifically then-Councilwoman Mendez and Councilwoman Rivera, engaged in off-the-record, private conversations with Defendant De Blasio, Defendant DOB, and representatives of Cooper Union, Joffrey Ballet, and Adelphi, after coordinating a plan with the direct help of Defendant Berman,

Defendant Sosnick, and GVSHP, for the purpose of undermining the leases Plaintiffs had in place and ensuring that building permits would not be (or remain) issued, depriving Plaintiffs of their valid property interest in a building permit.

311.    Upon information and belief, Defendants engaged in these conspiracies knowing that their interpretations were contrary to law and would result in constitutional injury.

312.    Defendants engaged in these conspiracies under color of law and in direct contravention of Plaintiffs' constitutional rights.

313.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies.

314.    Each of the government-employed Defendants, cloaked with the power of the government but operating outside of their normal government duties, acted out of their own personal interest in resurrecting the CHARAS/El Bohio community center. To accomplish this goal, Defendants have targeted and taken action against Plaintiffs' dorm project with deliberate indifference toward Plaintiffs' constitutional rights in furtherance of their own personal and political agenda.

315.    As a result of the conspiracy, Plaintiffs experienced severe economic and non-economic damages.

**SEVENTH CAUSE OF ACTION**

42 U.S.C. § 1985(3) – Conspiracy
(As against all Individual Defendants)

316.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

317.    Section 1985(3) prohibits "two or more persons in any state…[to] conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws[.]" 42 U.S.C § 1985(3).

318.    At all relevant times herein, the Defendants conspired amongst themselves in a way that deprived Plaintiffs of their constitutional rights.

319.    At all relevant times herein, Defendants acted in concert to inflict the unconstitutional equal protection injures alleged herein by entering into an understanding and concerted agreement to prevent Plaintiffs from renovating Old P.S. 64 into a dorm, which has— thus far—been a successful endeavor.

320.    The Defendants engaged in an overt act in furtherance of their goal, which resulted in substantial economic and non-economic damages, by engaging in actions that actively interfered with and substantially delayed Plaintiffs' ability to renovate Old P.S. 64 into a dorm.

321.    Upon information and belief, some of the Defendants, specifically then-Councilwoman Mendez and Councilwoman Rivera, engaged in off-the-record, private conversations with Defendant De Blasio, Defendant DOB, and representatives of Cooper Union, Joffrey Ballet, and Adelphi, after coordinating a plan with the direct help of Defendant Berman, Defendant Sosnick, and GVSHP, for the purpose of undermining the leases Plaintiffs had in place and ensuring that building permits would not be (or remain) issued, depriving Plaintiffs of their valid property interest in a building permit.

322.    Upon information and belief, Defendants engaged in these conspiracies knowing that their interpretations were contrary to law and would result in constitutional injury.

323.    Defendants engaged in these conspiracies under color of law and in direct contravention of Plaintiffs' constitutional rights.

324.    Each of the private-entity Defendants operated with significant encouragement from the government Defendants, as willful participants in a joint effort with the government, and/or were entwined with government policies.

325.    Each of the government-employed Defendants, cloaked with the power of the government but operating outside of their normal government duties, acted out of their own personal interest in resurrecting the CHARAS/El Bohio community center. To accomplish this goal, Defendants have targeted and taken action against Plaintiffs' dorm project with deliberate indifference toward Plaintiffs' constitutional rights in furtherance of their own personal and political agenda.

326.    As a result of the conspiracy, Plaintiffs experienced severe economic and non-economic damages.

**EIGHTH CAUSE OF ACTION**

42 U.S.C. § 1986—Action for Neglect to Prevent
(As against all Defendants)

327.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though set forth herein.

328.    Section 1986 states that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in Section 1985…, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured…for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented[.]" 42 U.S.C. § 1986.

329.    At all relevant times herein, the individually named Defendants did knowingly conspire to deprive Plaintiffs of their constitutional rights as set forth in the preceding paragraphs.

330.    At all times referenced herein, the individually named Defendants expressly conspired to conceal their acts by engaging in off-the-record conversations and discussions that played a role in establishing the conspiracy to deprive Plaintiffs of their constitutional rights.

331.    The Defendants all knew of this conspiracy and failed to terminate and/or prevent its execution, even though they each had the power to prevent or aid in preventing its commission with reasonable diligence.

332.    As a direct and proximate result of Defendants' failure to cease their conspiracy and/or intervene to prevent it, Plaintiffs sustained severe economic and non-economic damages.

## NINTH CAUSE OF ACTION

Tortious Interference with Prospective Economic Advantage
(As against all individual Defendants and GVSHP)

333.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though set forth herein.

334.    Plaintiffs had a business relationship with Cooper Union, Joffrey Ballet, and Adelphi.

335.    At all times relevant herein, Defendants knew that Cooper Union, Joffrey Ballet, and Adelphi were engaged in separate business relationships with Plaintiffs.

336.    Specifically, at all times relevant herein, Defendants knew that Cooper Union, Joffrey Ballet, and Adelphi were tenants of Plaintiffs at Old P.S. 64.

337.    As described above, Defendants directly targeted and interfered with the business relationship between the Plaintiffs and Cooper Union, Joffrey Ballet, and Adelphi.

338.    In doing so, the Government Defendants acted outside the scope of their authority for their respective positions.

339.     The Defendants' interfered solely out of malice and/or for the sole purpose of inflicting intentional harm on Plaintiffs.

340.     The Defendants interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

341.     As a result of the Defendants' interference, Cooper Union, Joffrey Ballet, and Adelphi each cancelled their lease with Plaintiffs.

342.     As a result of the Defendants' interference, Plaintiffs lost prospective economic relationships that would have expanded to other floors of the building post-renovation.

343.     As a result of the Defendants' interference, Plaintiffs lost prospective economic relationships in renewed leases on the floors that were rented by each respective tenant.

344.     As a result of the Defendants' interference, Plaintiffs were also damaged because under the DOB's current interpretation of Rule 51 a tenant is required before Plaintiffs can begin construction and renovate Old P.S. 64. By tortiously interfering with Plaintiffs' tenant business relationships, Plaintiffs are expending significant sums to maintain the building without a tenant, in addition to losing the money they would have had under the contracts with which the Defendants interfered.

345.     As a direct and proximate result of Defendants' tortious interference, Plaintiffs sustained severe economic and non-economic damages.

## TENTH CAUSE OF ACTION

Defamation *Per Se*
(As against Andrew Berman and GVSHP)

346.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though set forth herein.

347.    On January 2, 2018, GVSHP disseminated on Twitter a "Winter/Spring 2018 Newsletter" (the "2018 Newsletter"), which can also currently be viewed online as a PDF.[16] *See* Exhibit 30.

348.    The 2018 Newsletter included the following written statements (the "Statements"), which amount to actionable defamation *per se*:

> (1) "The developer who bought the building nearly twenty years ago has consistently sought to demolish and disfigure the building, allowed it to decay, and sought to place illegal uses there."

> (2) "[A] stalemate has persisted, as he has refused to restore the building, relinquish control, or locate legal and appropriate uses there."

> (3) "We intend to hold the Mayor to this commitment, and ensure that the current developer owner does not succeed in locating the illegal uses there." Exhibit 30.

349.    The written statements in the 2018 Newsletter are false, disparaging, derogatory, and misleading. At the very least, they imply or suggest that Plaintiffs' business of renovating Old P.S. 64 is plagued with illegitimacy and illegality and attempts to peddle improper uses on the property—all of which is patently false.

350.    Specifically, the Statements affirmatively state, as if it were a known and established fact, that Plaintiffs have been (and will continue to) purposefully "place illegal uses" on Old P.S. 64.

---

[16] *See Saved from the Wrecking Ball!*, GVSHP.ORG (last visited Jan. 23, 2018), http://www.gvshp.org/_gvshp/pdf/GVSHP%20Newsletter%20Winter-Spring%202018.pdf.

351.    The Statements were made in a way to imply that Defendants Berman and GVSHP, as speakers, were in possession of certain facts, unknown to the audience, which support their position that Plaintiffs were seeking to place illegal uses on the property.

352.    The Statements not only impugn the Plaintiffs' ability and intent to renovate and manage a dorm legally under the law, they also expose the Plaintiffs to public contempt, hatred, aversion, and disgrace by the community who comes across, reads, or subscribes to Defendant Berman and GVSHP's misinformation campaign.

353.    Defendants Berman and GVSHP have disseminated these aforementioned false ideas with actual malice toward Plaintiffs, knowing that the Statements were false or with utter and reckless disregard for the Statements' falsity.

354.    For example, Defendants Berman and GVSHP are well apprised of Old P.S. 64's history as outlined above, and they knew at the time these Statements were made that Plaintiffs had in the recent past submitted numerous applications for zoning determinations in order to seek additional clarity from the DOB as to the requirements for renovating Old P.S. 64 into a dorm. The DOB made a determination with which the Defendants disagreed and which the Defendants believed would favor the Plaintiffs' project. Despite Plaintiffs demonstrated attempts to seek clarity from the DOB through these determinations, Defendants Berman and GVSHP knowingly and recklessly perpetuate a contradictory notion that twists Plaintiffs' requests for clarity with the blatantly false and untenable idea that Plaintiffs are *consistently* seeking to put in place illegal uses on Old P.S. 64.

355.    Defendants Berman and GVSHP disseminated the Statements with utter and reckless disregard for the effect the Statements would have, and with the malicious, wanton, wrongful, and willful intent to injure Plaintiffs.

356.    The false Statements relate to Plaintiffs' status as a landlord, developer, owner, and manager of Old P.S. 64, making the Statements defamatory *per se*, since they are incompatible with the proper conduct of, and have the tendency to injure, Plaintiffs' business, trade, or profession.

357.    Upon information and belief, the 2018 Newsletter was published to third parties, for it was distributed through both social media and email, and it was offered in print form to buildings and businesses.

358.    Specifically, the 2018 Newsletter was viewed by the following third parties who "liked" the post on Twitter as of January 23, 2018:

    (1)    Iolita Shatter, who operates the following Twitter account: @Shatterlo.

    (2)    Charle-John Cafiero, who operates the following Twitter account: @CJCStrategists.

    (3)    Theodore Grunewald, who operates the following Twitter account: @TedGrunewald.

    (4)    Zella Jones, who operates the following Twitter account: @NoHoManhattan.

    (5)    Chess Forum, which operates the following Twitter account: @Chessforumnyc.

    (6)    WiFi-NY, which operates the following Twitter account: @WiFi_NY

(7)     TheChinzAge, which operates the following Twitter account: @ChintzAge.

(8)     Bobby Tanzilo, who operates the following Twitter account: @BobbyOnMKEcom.

(9)     Save Gansevoort, which operates the following Twitter account: @SaveGansevoort.

(10)    Steve Sinclair, who operates the following Twitter account: @SteveSinclairNY.

(11)    City Council Speaker Corey Johnson, who operates the following Twitter account: @CoreyinNYC.

359.    Additionally, the 2018 Newsletter was also viewed by the following third parties who "retweeted" the post on Twitter as of January 23, 2018:

(1)     CNU NYC, which operates the following Twitter account: @CNU_NYC.

(2)     Whitakertracy, who operates the following Twitter account: @Whitakertracy1.

(3)     Chess Forum, which operates the following Twitter account: @chessforumnyc.

(4)     Susan DeMark, who operates the following Twitter account: @scdemark.

(5)     Peter Feld, who operates the following Twitter account: @peterfeld.

(6)     Inwood Preservation, which operates the following Twitter account: @InwoodPres.

(7)     Nicole Beauchamp, who operates the following Twitter account: @NikkiBeauchamp.

(8)     TheChintzAge,   which   operates   the   following   Twitter   account: @ChintzAge.

(9)     Save   Gansevoort,   which   operates   the   following   Twitter   account: @SaveGansevoort.

(10)    Steve   Sinclair,   who   operates   the   following   Twitter   account: @SteveSinclairNY.

360.    Furthermore, the 2018 Newsletter and the Statements were read by a local in the community who then forwarded photos of the online PDF to Plaintiff Singer.

361.    The 2018 Newsletter remains accessible to an audience limited only by the breadth of the Internet, as it remains posted prominently on Twitter and as a PDF online.

362.    Defendants Berman and GVSHP made the Statements without justification or privilege.

363.    As a result of Defendant Berman and GVSHP's Statements, the Plaintiffs have sustained, and will continue to sustain, irreparable damage to their business, good name, and reputation in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, upon all of the facts and circumstances herein alleged, Plaintiffs respectfully request that this Court:

A.      Grant judgment against the Defendants on each and every cause of action as alleged and delineated herein;

B.      Invalidate the unconstitutional condition currently in place;

C.      Grant compensatory damages against the Defendants in the amount to be determined at trial;

D.      Grant punitive damages against the Defendants in the amount to be determined at trial;

E.      Grant injunctive relief that will enjoin the Defendants from violating the Plaintiffs' Constitutional and state-law rights;

F.      Grant any other damages permitted to be recovered by law pursuant to the above causes of action;

G.      Grant an award of reasonable attorney's fees and costs expended in connection with the prosecution of this action pursuant to 42 U.S.C. § 1988; and

H.      Grant any such further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:  Garden City, New York
       January 24, 2018

GERSTMAN SCHWARTZ & MALITO, LLP

By:  */s/ David M. Schwartz*
     David M. Schwartz, Esq. (DS 9776)
     1399 Franklin Avenue, Suite 200
     Garden City, New York 11530
     Tel. No.: (516) 880 – 8170
     dschwartz@GerstmanSchwartz.com

By:  */s/ Ian-Paul A. Poulos*
     Ian-Paul A. Poulos, Esq. (IP 2125)
     1399 Franklin Avenue, Suite 200
     Garden City, New York 11530
     Tel. No.: (516) 880 – 8170
     ipoulos@GerstmanSchwartz.com